## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MARK EVANS,
    Plaintiff

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:10-cv-779
Dlott, J.
Litkovitz, M.J.

**REPORT AND**
**RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 10), the Commissioner's response in

opposition (Doc. 13), and plaintiff's reply memorandum. (Doc. 14).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in February 2007, alleging disability since

January 1, 2002, due to obesity, high blood pressure, lower back pain, a hernia, sleep apnea, and

"nerves." (Tr. 125). Plaintiff's applications were denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a de novo hearing before ALJ James

Sherry. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On

September 30, 2009, the ALJ issued a decision denying plaintiff's DIB and SSI applications.

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ

the final administrative decision of the Commissioner.

## II. Medical Evidence

### A. Physical Impairments

On July 7, 2003, plaintiff presented to the emergency room at Dearborn County Hospital. (Tr. 309-319). He complained of pain and swelling in his feet and legs and of problems getting his shoes on over the last 24 hours. Plaintiff was diagnosed with dependent pedal edema[1] and left calcaneal spur, and he was prescribed support hose for venous insufficiency. A chest x-ray revealed a pulmonary nodule.

Plaintiff was treated by Dr. C. Robert Claydon in July and August 2003. On July 10, 2003, plaintiff was diagnosed with a pulmonary nodule, edema of the left extremity, knee pain, heel pain, chest pain with anxiety and depression, and tobacco use. (Tr. 284). Dr. Claydon warned plaintiff that his lifestyle choices were putting him at high risk for an early death. Dr. Claydon expressed serious concern that the chest pain was myocardial ischemia. Plaintiff expressed concern about pursuing treatment because of the costs. Dr. Claydon referred plaintiff to a podiatrist for his heel pain, advised him regarding weight loss to help alleviate his knee pain, recommended medication to help him deal with stress, and discussed stopping smoking. He prescribed Clorazepam. On July 24, 2003, Dr. Claydon examined plaintiff and expressed concern that plaintiff had not gone to the emergency room for chest pain as they had agreed since the chest pain could be a heart attack about to happen. (Tr. 283). Dr. Claydon advised plaintiff to have testing done.

On August 7, 2003, plaintiff complained of chest pains and frequent shortness of breath.

---

[1]Pedal edema is swelling of the feet and ankles.
http://medical-dictionary.thefreedictionary.com/pedal+edema (last accessed 11/16/2011).

(Tr. 281-82). His edema was a little better, and he still had chest pain when he was upset, although it was less severe. Dr. Claydon diagnosed plaintiff with chest pain, a lung granuloma, and tobacco abuse. He strongly advised plaintiff to see a cardiologist and to have testing done to rule out heart problems as soon as possible, but plaintiff refused. Dr. Claydon acknowledged that plaintiff's symptoms could be caused by anxiety.

Dr. Claydon saw plaintiff on August 11, 2003, and Dr. Claydon again advised him to see a cardiologist as soon as possible. (Tr. 280). On August 15, 2003, Dr. Claydon referred plaintiff to a surgical clinic for his umbilical hernia. (Tr. 279). Dr. Claydon also warned plaintiff of risk factors for his heart, and he strongly advised plaintiff to follow up on making an appointment with the cardiologist.

On February 9, 2005, plaintiff presented to the Dearborne County Hospital emergency room complaining of fever, abdominal pain, and diarrhea. (Tr. 296-308). He was diagnosed with gastroenteritis. On examination, plaintiff had left side pedal edema. An x-ray of the abdomen showed an umbilical hernia.

Plaintiff was seen at the Community Health Clinic several times between March 2006 and February 2007.[2] The treatment notes reflect the following complaints and findings:

- March 16, 2006-plaintiff complained of being overweight, having pitting edema in his legs, and injuring his left knee three to four days earlier. He complained of not being able to sleep, and it was noted that he might have sleep apnea. Although plaintiff reported he had done auto body work in the past, he stated that

---

[2]It is not clear who the treating source was at the Community Health Clinic because the notes are not signed. In his Statement of Errors, plaintiff attributes these notes to Dr. Schreibman "of Lynchburg Medical Center." (Doc. 10 at 4). The Commissioner argues that Dr. Schreibman was not treating plaintiff as late as October 2007 because ER records from that date note that plaintiff told the ER doctor he did not have a physician as of that date, and plaintiff was instructed to follow up with a primary care physician of his choice. (Tr. 248). Plaintiff does not address the Commissioner's contention in his reply brief. Thus, the record does not establish that Dr. Schreibman treated plaintiff at the Community Health Clinic.

he could no longer walk much or get up and down. An umbilical hernia, which plaintiff could not afford to get fixed at that time, was noted. Plaintiff's weight was listed as in excess of 400 pounds. (Tr. 194).

- April 18, 2006-plaintiff complained of retaining water in his legs and of pain. He complained he could not get under a car or stand for more than 15 minutes because of pain in his legs. (Tr. 193).

- November 16, 2006-plaintiff was getting more dependent edema bilaterally and was very short of breath. His weight was 430 pounds. He was prescribed Benicar. (Tr. 196).

- February 7, 2007-plaintiff complained of arm stiffness and was prescribed Vicodin. (Tr. 195).

Plaintiff presented to the Brown County General Hospital on October 30, 2007, complaining that he had injured his back after moving some boxes that morning. (Tr. 248-254). He stated that he had previous back problems. An x-ray showed mild degenerative changes and no acute findings. Plaintiff was diagnosed with back pain and an acute lumbar strain. He was discharged after being started on Robaxin, given ten Darvocet tablets to take as needed, and advised to take an over-the-counter pain reliever and to follow up with a primary care physician.

There are medical records showing that plaintiff treated with Dr. Paul Schreibman at the Lynchburg Medical Center from November 2007 to May 2009. Dr. Schreibman's notes reflect the following:

- November 21, 2007- plaintiff complained that he felt something sharp in his back when he reached out with his right arm and he could not bend over to tie his shoes. Plaintiff was prescribed Vicodin. (Tr. 264).

- May 2008-plaintiff requested that forms be completed for SSI. He was prescribed Vicodin. (Tr. 263).

- July 17, 2008-12 complaints were listed, including physical complaints of poor sleep, being tired, legs getting weak, and dizzy spells. Plaintiff was continued on Xanax and Vicodin. (Tr. 262).

- March 10, 2009-plaintiff complained of trouble breathing at night, severe lower back pain which Vicodin did not relieve, and weak knees when he got up to use

4

the bathroom at night. Plaintiff was prescribed Vicodin. (Tr. 268).

-   May 12, 2009-plaintiff called with a complaint that a diuretic that had been prescribed for swelling of his legs in March 2009 (Tr. 268) was not helping much and to ask if he could increase the dosage. His Vicodin prescription was refilled. (Tr. 267).

-   June 25, 2009-follow-up for complaints of left knee pain following emergency room visit for left knee sprain (Tr. 270-277-x-ray also revealed mild tricompartmental osteoarthritis). Plaintiff complained he could not grab hold of anything; back pain was his worse problem; and he could no longer get on the ground to work on cars. He complained of chronic pain. His weight was listed as 430 pounds. (Tr. 265).

On April 10, 2008, Dr. Schreibman completed a "Physical Residual Functional Capacity Questionnaire." (Tr. 256-260). Dr. Schreibman listed plaintiff's diagnoses as low back pain, morbid obesity (more than 400 pounds), hypertension, and generalized anxiety disorder, and he listed plaintiff's prognosis as guarded. He opined that plaintiff's impairments had lasted or could be expected to last at least 12 months and that plaintiff was not a malingerer. Dr. Schreibman reported that anxiety and a personality disorder (anger control) affected plaintiff's physical condition. He opined that during a typical workday, plaintiff's pain or other symptoms were severe enough to interfere with the attention and concentration required to perform even simple work tasks frequently, and that plaintiff could tolerate only low stress jobs due to low back pain and generalized anxiety with poor anger control. He opined that plaintiff could walk 1 city block without rest or severe pain, sit 30 minutes at a time, stand 20 minutes at a time, sit less than 2 hours in an 8-hour workday, and stand/walk less than 2 hours in an 8-hour workday; he needed to walk every 30 minutes; he could never look up or down, turn his head right or left, or hold his head in a static position; he could never twist, stoop, crouch/squat, or climb ladders; and he could rarely climb stairs. Dr. Schreibman reported that plaintiff's impairments were likely to produce "good days" and "bad days" and that he was likely to be absent from work about one day per

month.

Michael Stenly, PA, of Lynchburg Medical Center completed a "Basic Medical" form for purposes of public assistance. (Tr. 325-26). He indicated that he had last examined plaintiff on June 25, 2009. Mr. Stenly listed plaintiff's conditions as follows: anxiety NOS with panic attacks; mood disorder-bipolar; chronic knee and back pain with his girth increasing the pain; morbid obesity (430 pounds at 6'3"); and reactive airway disease-shortness of breach and chest pain. Psychological/psychiatric findings included panic attacks and anger outbursts. Additional treatments which were indicated included stress tests for plaintiff's cardiac symptoms; MRIs for his shoulder, lumbar spine and knees; tests for asthma; and bariatric surgery for weight loss to reduce knee and back pain and coronary artery disease.

Dr. Olayinka Aina, M.D., MPH, examined plaintiff on behalf of the state agency on April 30, 2007. (Tr. 205-212). Dr. Aina found no muscle spasm; no spasticity, clonus or primitive reflexes; and no muscle atrophy. Plaintiff's main complaints were low back pain, bilateral knee pain, and hip pain. His medical history included umbilical hernia, hypertension, and sleep apnea. Dr. Aina noted that plaintiff is morbidly obese, with his weight recorded as 425 pounds. Plaintiff's medications were listed as Vicodin, Xanax and Benicar. Plaintiff had a normal gait and did not use any assistive devices. Examination of the chest revealed bilateral symmetry with good excursion on inspiration. Lungs were clear without wheezes to auscultation in all fields. Examination of the extremities revealed no appreciable edema. Plaintiff had normal toe, heel and tandem walk. Examination of all the joints did not reveal any edema, erythema, or echymosis. There was no tenderness on palpation of all the joints. The only abnormality was in the lumbosacral region where plaintiff had limitation in the range of motion, as well as limitation in range of motion in the knee, although the patella was unremarkable bilaterally. All joints,

6

including the knee joints, were stable. Neurological exam was negative in terms of DTRs and sensory, and no atrophy was present. Dr. Aina concluded that plaintiff should be able to lift, pull and push about 40 pounds occasionally and about 30 pounds frequently, and prolonged sitting and standing may be affected.

State agency medical consultant Dr. Maria Congbalay, M.D., reviewed the record on June 12, 2007. (Tr. 232-239). She opined that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. As support for her conclusions, Dr. Congbalay noted Dr. Aina's findings that plaintiff's blood pressure was 132/80; his lungs were clear without wheezes; he had good femoral pulses; he had no appreciable edema; he had normal gait and toe, heel and tandem walk; there was no tenderness to palpation of any joints; all joints were stable; lumbosacral range of motion was flexion 60 degrees, extension and right lateral flexion 10 degrees, and left lateral flexion 20 degrees; right knee flexion was 120 degrees; and left knee flexion was 130 degrees. According to Dr. Congbalay, plaintiff could frequently crawl, crouch, kneel, stoop and climb ramps and stairs, and he could never climb ladders/ropes/scaffolds.

### B. Mental Impairments

In July 2003, Dr. Claydon diagnosed plaintiff with anxiety and depression and recommended an antidepressant to help plaintiff deal with stress. (Tr. 284). Plaintiff was taking Clorazepam. (Tr. 283). Dr. Claydon prescribed medication for stress and anxiety in August 2003 after informing plaintiff that his chest pain might be due to anxiety. (Tr. 281). On August 11, 2003, Dr. Claydon discussed with plaintiff the possibility that plaintiff could be bipolar and recommended that he see a psychiatrist. (Tr. 280). On August 15, Dr. Claydon made recommendations to plaintiff about pursuing follow-up for his anger outbursts. (Tr. 279).

7

When he visited the Community Health Clinic on March 16, 2006, plaintiff reported that he was there because he was borderline depressed, his nerves were very bad, and he had anxiety attacks which caused him life problems. (Tr. 194). Plaintiff complained that he had unsuccessfully tried several medications, including Xanax (the higher-strength dose reportedly made him "goofy"); Valium, which helped but made his head tingle; and Zoloft, which made him "a nervous wreck." (*Id.*). Plaintiff complained that he was under a lot of stress and he could not sleep. He was prescribed Lorazepam. At an office visit the following month, plaintiff complained that the Lorezepam had not helped and Paxil had done nothing for the anxiety. (Tr. 193). Plaintiff was prescribed Xanax at office visits to the Community Health Clinic and Lynchburg Medical Center in April 2006, November 2006, February 2007 and November 2007. (Tr. 193, 195, 196, 264). Plaintiff reported to Dr. Schreibman during one office visit that he could not handle the taxi business because he did not get along with the passengers and he had a bad temper. (Tr. 263). His Xanax dosage was increased. In July 2008, plaintiff complained to Dr. Schreibman of problems with memory, being preoccupied and forgetful, and being nervous. (Tr. 262). He was prescribed Xanax. In June 2009, Dr. Schreibman noted a history of panic attacks. (Tr. 265).

Examing consultant Dale Seifert, MS Ed., completed a psychological examination of plaintiff on behalf of the state agency on May 2, 2007. (Tr. 197-204). Plaintiff reported that he did not drink daily but alcohol abuse was a problem. He had abused cocaine but at the time of the exam had been sober for approximately one year. He had never been hospitalized for adjustment problems. Plaintiff reported he feels nervous, he frequently feels anxious, and he occasionally has tremors but does not have panic attacks. He occasionally has problems relating with people and has no friends. He occasionally goes through mood swings but mostly feels

8

down. He has no delusions or hallucinations, although he feels people are plotting against him. He has trouble sleeping and chronically feels fatigued. During the exam, plaintiff had trouble organizing his thoughts and was slow in processing. He was able to respond relatively well to questions. He had no thought fragmentation or loose associations. No vegetative signs were noted. He was anxious during the interview and testing. Eye contact was poor in amount and quality. His cognitive skills appeared to fall in the low average range. Plaintiff stated that he did not want counseling and he felt his medicine was somewhat helpful.

Mr. Seifert diagnosed plaintiff with generalized anxiety disorder, alcohol abuse and cocaine abuse (reported sober one year). He assigned plaintiff a Global Assessment of Functioning (GAF) score of 60[3]. Mr Seifert opined that plaintiff has mild limitations in his ability to relate to others, including fellow workers and supervisors; mild limitations in the ability to understand and follow instructions; moderate limitations in the ability to maintain attention to perform simple/repetitive tasks; and moderate limitations in the ability to withstand the stress and pressures associated with day-to-day work activity because of his anxiety.

In May 2007, state agency psychologist Mel Zwissler, Ph.D., reviewed the record and completed a "Psychiatric Review Technique" form and a "Mental Residual Functional Capacity Assessment" form. (Tr. 213-230). Dr. Zwissler opined that plaintiff has mild restriction in his activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 224). Dr. Zwissler further opined that plaintiff is moderately limited in

---

[3]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with scores of 51-60 are classified as having "moderate" symptoms. *Id.*

his ability to maintain attention and concentration for extended periods; moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderately limited in the ability to interact appropriately with the general public; and moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 228-229). Dr. Zwissler concluded that plaintiff's ability to relate to others is mildly limited; his ability to understand and follow directions is mildly limited; his ability to maintain attention is moderately limited; and his ability to withstand stress is moderately limited. (Tr. 230). Dr. Zwissler determined that plaintiff appears to be able to handle tasks that are repetitive in nature and do not have strict production demands. (*Id.*). Dr. Zwissler found plaintiff's statements to be credible and consistent with the medical evidence. (*Id.*). Dr. Zwissler gave considerable weight to the consultative examining psychologist, Mr. Seibert. (*Id.*). Another state agency reviewing psychologist, John Waddell, Psy.D., affirmed Dr. Zwissler's assessment as written in September 2007. (Tr. 244-245).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)

(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the

sequential evaluation process. *Id.; Wilson* v. *Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir.

2004). Once the claimant establishes a prima facie case by showing an inability to perform the

relevant previous employment, the burden shifts to the Commissioner to show that the claimant

can perform other substantial gainful employment and that such employment exists in the

national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.

1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The claimant met the insured status requirements of the Social Security Act through March 31, 2004.
>
> 2. The claimant has not engaged in substantial gainful activity since July 7, 2003,

11

the alleged onset date[4] (20 C.F.R. 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: lumbar degenerative disc disease; degenerative joint disease of the knees with mild tricompartmental osteoarthritis of the left knee; morbid obesity; obstructive sleep apnea; generalized anxiety disorder; and polysubstance abuse (alcohol and cocaine) (20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except as follows: he can frequently lift and/or carry 10 pounds and can lift up to 20 pounds at a time. He can stand/walk for [a] total of two hours in an eight-hour workday. He can sit for [a] total of six hours in an eight-hour workday. Pushing/pulling is unlimited within the lifting restrictions. The claimant can never climb ladders/ropes/scaffolds. He can occasionally balance, stoop, crouch, kneel, and crawl. The job should be limited to simple, routine, and repetitive tasks. There should be no strict time or production requirements.

6. The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7. The claimant was born on December 21, 1964 and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

---

[4]Plaintiff changed the alleged onset date of January 1, 2002, as set forth in his DIB and SSI applications, to an alleged onset date of July 7, 2003, at the ALJ hearing. (Tr. 26).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 7, 2003 through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 12-18).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving

13

weight to treating physician's opinion, thereby violating the agency's own regulations).

## D. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred in determining plaintiff's RFC by failing to give sufficient weight to the opinion of his treating physician, Dr. Paul Schreibman; (2) the ALJ erred by failing the address the RFC assessment of Michael Stenly, PA, which the VE testified would preclude the performance of the jobs the VE identified on a sustained 40-hour per week basis; (3) the ALJ erred in finding plaintiff's mental impairments did not meet or equal Listings 12.06 and 12.04; and (4) the ALJ erred by failing to provide a narrative discussion as required by Social Security Ruling 96-8p, 1996 WL 374184, of how he arrived at plaintiff's RFC to do work activities on a "regular and continuing basis" given his combined limitations.

### 1. The ALJ did not err in finding plaintiff failed to meet the Listings.

The Court will initially address plaintiff's third assignment of error, which alleges that the ALJ erred by failing to find that plaintiff's mental impairments did not meet or equal Listings 12.04 and 12.06. (Doc. 10 at 13-15). The ALJ evaluated plaintiff's mental impairments under Listing 12.06 (anxiety-related disorders) and 12.09 (substance addiction disorders). The ALJ determined that the "paragraph B" criteria are not satisfied because plaintiff has only mild restriction in activities of daily living and in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 14).

In his Statement of Errors, plaintiff does not discuss the requirements of Listing 12.04 (affective disorders), and he has not explained how the ALJ erred in finding he does not meet this Listing. Thus, the Court is unable to discern from plaintiff's brief any specific error in this regard.

The Commissioner does not dispute that plaintiff suffers from an anxiety-related disorder

14

so as to satisfy Part A of Listing 12.06. However, the Commissioner argues that plaintiff does not satisfy at least two of the "paragraph B" criteria which a claimant must satisfy in order to meet the Listings for a mental impairment, which are: (1) marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.

Plaintiff argues that he meets Listing 12.06 based on the medical records of Dr. Claydon and Dr. Schreibman, as well as the psychological evaluation performed by Mr. Seibert. Plaintiff states that Mr. Seibert reported plaintiff has problems relating to co-workers and supervisors, and he has limitations in his ability to maintain attention to perform simple, repetitive tasks and to withstand stress and pressures of the workplace due to his anxiety. Plaintiff notes that in finding he did not meet Listing 12.06, the ALJ credited the assessments of the non-examining state agency psychologists over the assessments of the consultative examining psychologist and the treating sources. Plaintiff contends that the ALJ's conclusions regarding Listing 12.06 are not supported by substantial evidence and must be reversed.

Substantial evidence supports the ALJ's determination that the "paragraph B" criteria are not satisfied in this case. (Tr. 15). Contrary to plaintiff's argument, the ALJ gave "great weight" to the assessment of the consultative psychologist, Mr. Seifert, (Tr. 16), whose opinion that plaintiff would have only moderate limitations in work-related areas of functioning supports a finding that plaintiff does not meet Listing 12.06. There are no opinions from an examining or treating source which contradict the opinions of Mr. Seifert and the non-examining state agency psychologists that plaintiff is no more than moderately impaired in any work-related area of functioning. Plaintiff's assignment of error as to the ALJ's determination that his mental

impairments do not meet or equal the Listings is not well-taken and should be overruled.

## 2. The ALJ erred in weighing the opinions of plaintiff's treating physician.

Plaintiff's first assignment of error alleges that the ALJ erred by failing to give controlling weight to the opinions of plaintiff's treating physician, Dr. Schreibman. In an April 2008 RFC assessment, (Tr. 256-260), Dr. Schreibman reported that anxiety and a personality disorder (anger control) affected plaintiff's physical condition. He opined that during a typical workday, plaintiff's pain or other symptoms were severe enough to interfere with the attention and concentration needed to perform even simple work tasks frequently, and that plaintiff could tolerate only low stress jobs due to low back pain and generalized anxiety with poor anger control. He opined that plaintiff could walk 1 city block without rest or severe pain, sit 30 minutes at a time, stand 20 minutes at a time, sit less than 2 hours in an 8-hour workday, and stand/walk less than 2 hours in an 8-hour workday; he would need to walk every 30 minutes; he could never look up or down, turn his head right or left, or hold his head in a static position; he could never twist, stoop, crouch/squat, or climb ladders; and he could rarely climb stairs. Dr. Schreibman reported that plaintiff's impairments were likely to produce "good days" and "bad days" and that he was likely to be absent from work about one day per month. Dr. Schreibman opined that plaintiff's impairments had lasted or could be expected to last at least 12 months. The VE testified that Dr. Schreibman's RFC would rule out competitive employment. (Tr. 49).

The ALJ gave "little weight" to Dr. Schreibman's "assessments."[5] (Tr. 17). The ALJ explained his rationale in one sentence: "[Dr. Schreibman] is not a specialist, his opinion is not

---

[5]The ALJ erroneously attributes Exh. 20F (Tr. 321-22) to Dr. Schreibman. (Tr. 17). Exh. 20F is actually an RFC assessment completed by Michael Stenly, PA, of the Lynchburg Medical Center. Exh. 21F (Tr. 325-26) is a duplicate copy. Plaintiff also erroneously attributes the assessment to Dr. Schreibman in connection with his first assignment of error. (Doc. 10 at 10, citing Tr. 321-22, Tr. 325-26). Plaintiff correctly attributes the assessment to the PA in his second assignment of error, wherein he argues that the ALJ erred by failing to address the assessment completed by the PA. (Doc. 10 at 11-13).

16

well supported by medically acceptable clinical findings and laboratory diagnostic techniques, and his opinion is based heavily on self-reports." (*Id.*). The ALJ provided no further explanation for rejecting the treating physician's opinions.

The ALJ's decision to give "little weight" to the assessment of the treating physician in this case is without substantial support in the record. It is well-established that the findings and opinions of treating physicians are generally entitled to substantial weight, and if the opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and uncontradicted by other substantial evidence, then they are entitled to controlling weight. *See Blakley*, 581 F.3d at 406; *Wilson*, 378 F.3d at 544; *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). "[A] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected." *Cole v. Astrue*, 652 F.3d 653, 660 (6th Cir. 2011) (quoting *Blakley*, 581 F.3d at 408). When the ALJ declines to give controlling weight to a treating physician's assessment, "the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406. In accordance with this rule, the ALJ must give "good reasons" for the ultimate weight afforded the treating physician's opinion, based on the evidence in the record, and the reasons must be sufficiently specific to enable meaningful review of the ALJ's decision. *Id.* (citing 20 C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p, 1996 WL 374188, at *5; *Wilson*, 378 F.3d at 544). The ALJ's failure to adequately explain the reasons for the weight given a treating physician's opinion "*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record." *Blakley*, 581 F.3d at 407 (emphasis in the original and quoting *Rogers*, 486 F.3d at

243).

Here, the ALJ's decision does not reflect an analysis of the regulatory factors in weighing Dr. Schreibman's opinion. *See* 20 C.F.R. § 404.1527(d)(2). The ALJ has failed to satisfy the "good reasons" standard set forth by the Sixth Circuit in *Wilson* for discounting Dr. Schreibman's assessment. First, the ALJ faulted Dr. Schreibman's assessments because he is not a "specialist." However, the ALJ did not explain why a specialist, or what type of specialist, would be better qualified than an internist or general practitioner to assess plaintiff's physical limitations caused by his numerous impairments as complicated by his obesity and his anxiety disorder. Nor did the ALJ indicate that either Dr. Aina or Dr. Congbalay is a specialist so that their opinions could reasonably be assigned greater weight than the opinion of Dr. Schreibman on this basis.

Second, the ALJ failed to give any consideration to the length of the treatment relationship and the frequency of examination, or to the nature and extent of the treatment relationship plaintiff had with Dr. Schreibman. The record here indicates that plaintiff began treatment with Dr. Schreibman at least as early as November 2007. Over a year's worth of progress notes detailing plaintiff's treatment with Dr. Schreibman are included in the record. (Tr. 262-65, 267-68). However, when summarizing the medical evidence, the ALJ mentioned only the treatment records from 2009 by noting: "Treatment records from Dr. Paul Schreibman in 2009 document morbid obesity and complaints of chronic knee and back pain (Exhibit 16F)." (Tr. 13). The ALJ did not mention Dr. Schreibman's records at all in analyzing the weight to give the RFC assessment completed by Dr. Schreibman. (Tr. 17).

Third, the ALJ did not consider whether Dr. Schreibman's opinion is consistent with the record as a whole. The ALJ set out some of the medical evidence but undertook no analysis of that evidence to determine whether plaintiff's medically determinable impairments, considered in

18

combination, rendered plaintiff disabled. Nor did the ALJ consider Dr. Schreibman's opinion in light of the other evidence of record, such as plaintiff's daily activities and complaints of pain.

Fourth, although the ALJ found that Dr. Schreibman's opinion is not well-supported by medically acceptable clinical findings and laboratory diagnostic techniques, the ALJ failed to point to any evidence whatsoever in the record to support his finding, leaving the Court without an evidentiary basis to assess the ALJ's finding. Simply stating the assessment is not supported by the medical signs or findings does not necessarily make it so.

In fact, it is impossible to determine from the ALJ's decision how the ALJ reconciled the seemingly conflicting assessments of Dr. Schreibman, consultative examiner Dr. Aina, and non-examining physician Dr. Congbalay in this case, as well as what evidence the ALJ relied on in determining the weight to give the various physicians' opinions. The ALJ stated that he gave "great weight" to the assessment of Dr. Congbalay; "some weight" to the opinion of Dr. Aina to the extent it was consistent with the ALJ's RFC finding and his decision "for the same reasons given to Dr. Congbalay;" and "less weight" to the assessments of Dr. Schreibman. (Tr. 16). Dr. Congbalay opined that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand/walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. (Tr. 232-239). The ALJ decided to give "great weight" to Dr. Congbalay's opinion because he determined she is an acceptable medical source; her opinion was supported by medical signs/findings on examination and was consistent with other medical evidence of record; her opinion adequately considered the combined effect of plaintiff's severe impairments, including limitations due to his obesity; and her opinion was "not contradicted by the opinion of an acceptable treating source." (Tr. 16). However, Dr. Schreibman is an "acceptable treating source," and contrary to the ALJ's statement, Dr. Schreibman's opinion as to the degree of

plaintiff's functional limitations seemingly contradicted Dr. Congbalay's opinion.[6]  As to Dr.

Aina, who opined that plaintiff could lift 40 pounds occasionally and 30 pounds frequently and

that prolonged sitting and standing may be affected (Tr. 205-212), the ALJ did not cite any

reasons or evidence for departing from the general rule that the opinion of a non-treating but

examining source is generally entitled to more weight than the opinion of a source who has not

examined the claimant.  *See Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir.

2010) (citing 20 C.F.R. § 404.1527(d)(1)).  *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873,

875 (6th Cir. 2007).  Nor did the ALJ indicate that he gave any consideration to the fact that Dr.

Congbalay offered an RFC opinion in June 2007 (Tr. 232-239), before the majority of the

medical evidence was entered in the record, including the subsequent assessments by Dr.

Schreibman (Tr. 256-260) and the physician's assistant.  (Tr. 325-26).  The ALJ is required to

give "some indication that [he] at least considered these facts before giving greater weight to an

opinion that is not based on a review of a complete case record."  *See Blakley*, 581 F.3d at 409.

*See also Shelman*, 821 F.2d at 321; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

Thus, while the ALJ stated he gave "little weight" to Dr. Schreibman's assessments, the

ALJ's decision does not reflect the ALJ's analysis of the regulatory factors so as to enable this

Court to meaningfully review the ALJ's conclusion.  While it may be true that Dr. Schreibman's

opinion, though categorized as a treating source opinion, should not ultimately be accorded

controlling weight as to plaintiff's RFC, the ALJ did not undertake the required analysis to arrive

at that conclusion.  Because the ALJ failed to consider the factors listed in 20 C.F.R. §§

404.1527(d)(2) and 416.927(d)(2) in determining the weight to give Dr. Schreibman's opinions,

---

[6]Dr. Schreibman opined that plaintiff could sit less than 2 hours and stand/walk less than 2 hours in an 8-hour workday; he would need to walk every 30 minutes; he could never twist, stoop, crouch/squat, or climb ladders; and he could rarely climb stairs.  (Tr. 256-260).

the ALJ's rejection of the treating physician's RFC assessment is not supported by substantial evidence. The ALJ's decision in this respect constitutes legal error warranting a reversal and remand of this case for reconsideration of plaintiff's RFC, including proper analysis of the weight to be given Dr. Schreibman's assessment consistent with the treating source regulation. 20 C.F.R. §§ 404.1527(d), 416.927(d); *Wilson*, 378 F.3d at 546. *See also Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 545) (the Sixth Circuit has made clear that the Court should not "hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" and when the Court "encounter[s] opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.").

### 3. The ALJ erred by not addressing the physician assistant's RFC.

Plaintiff's second assignment of error alleges that the ALJ erred by not addressing the RFC assessment issued by Michael Stenly, PA, from Lynchburg Medical Center. Plaintiff contends that Mr. Stenly, a physician's assistant, is an "acceptable medical source" under 20 C.F.R. §§ 404.1513(d) and 416.913(d) and Social Security Ruling 06-03p, 2006 WL 2329939. Plaintiff notes that the VE testified if the limitations imposed by Mr. Stenly were accepted, there would be no jobs available that plaintiff could perform on a sustained 40-hour per week basis.

Initially, the Court notes that contrary to plaintiff's contention, Mr. Stenly is not an "acceptable medical source." Rather, under the regulations, a physician's assistant is a "medical source" who is included under the category of "other sources." *See* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). The distinction is important because only "acceptable medical sources" can give medical opinions and be considered treating sources whose medical opinions may be entitled to controlling weight. *See* SSR 06-03p. However, the Commissioner may use evidence from "other sources" to show the severity of the claimant's impairments and how they affect the

21

individual's ability to function. *Id.* ("Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."). The Commissioner is required to consider opinion evidence from other sources when evaluating an acceptable medical source's opinion using the factors applicable to the particular facts of each case. *Id. See also Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (a finding of substantial evidence must be "based on the record as a whole" and must "take into account whatever in the record fairly detracts from its weight.") (citations omitted).

The Commissioner argues that the ALJ was not required to discuss Mr. Stenly's opinion because the PA opined that plaintiff would not be able to work for up to 11 months, and therefore the opinion does not establish that plaintiff's impairments would last for a continuous period of not less than 12 months. The Commissioner's post-hoc rationalization for the ALJ's failure to discuss Mr. Stenly's assessment does not satisfy the ALJ's obligation to consider all relevant evidence in the case, including evidence from medical sources such as Mr. Stenley, and to evaluate the evidence from such medical sources in accordance with the particular factors applicable in this case. The ALJ's passing mention of Mr. Stenly's assessment, which the ALJ erroneously attributed to Dr. Schreibman, leaves no basis for this Court to review the ALJ's treatment of this evidence. The ALJ's omission was not harmless because the VE testified that if the limitations imposed by Mr. Stenly were accepted, plaintiff would not be able to perform competitive employment. (Tr. 50). *See Ealy*, 594 F.3d at 516 (in order for a VE's testimony to constitute substantial evidence that a significant number of jobs exists, "the question[s] must accurately portray a claimant's physical and mental impairments.") Plaintiff's third assignment of error should be upheld.

### 4. The ALJ erred by failing to include in the RFC assessment a narrative discussion of how he arrived at the RFC.

Plaintiff alleges as his fourth assignment of error that the ALJ failed to provide a narrative discussion as required by SSR 96-8p of how he arrived at plaintiff's RFC to do work activities on a "regular and continuing basis" despite his combined limitations. Plaintiff contends the ALJ disregarded his testimony that he has anxiety attacks daily, is obese, and has uncontrolled blood pressure. Plaintiff also argues that the ALJ failed to take into account limitations on stooping that Dr. Schreibman placed on him, which when considered in conjunction with his knee problems, hernia, and morbid obesity, would preclude him from performing sedentary work. (Doc. 14 at 3, citing Social Security Ruling 96-9p).[7]

Plaintiff further alleges that the ALJ disregarded Mr. Seifert's findings that he was slow in processing questions and responding and would have limitations in his ability to maintain attention to perform simple repetitive tasks and withstand stress and pressures due to his anxiety, and by finding plaintiff could perform machine tender jobs, machine operator jobs/envelope sealer jobs and inspector jobs, all of which require fast paced work. Plaintiff also asserts that the ALJ erred by failing to take into account the mental limitations imposed by his treating physician, Dr. Schreibman, who diagnosed plaintiff with anxiety and the personality disorder of poor anger control, and opined that plaintiff's pain and symptoms are severe enough to frequently interfere with attention and concentration.

The Commissioner contends that the ALJ reasonably relied on the evidence of record regarding plaintiff's mental impairments to assess the functional limitations resulting from those

---

[7]SSR 96-9p, 1996 WL 374185, at *8, states: "An ability to stoop occasionally[,] i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A *complete* inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work. Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping." (emphasis in the original).

impairments and to conclude that plaintiff could perform simple, routine and repetitive tasks with no strict time or production requirements.

The Court is unable to discern from the ALJ's opinion how he arrived at the RFC decision and what evidence he relied on in making that decision. As stated in connection with the first and third assignments of error, the ALJ did not adequately set forth his reasons for rejecting the opinions of plaintiff's treating doctor and for failing to take into account the opinion of the PA as to plaintiff's functional limitations. Nor did the ALJ set forth or analyze all of the relevant medical evidence in this case. The ALJ's decision recites plaintiff's statements as to his limitations, as well as Dr. Aina and Mr. Seibert's examination findings and opinions. (Tr. 13-14). The ALJ gave brief mention to the findings and opinions of the treating physician, Dr. Schreibman. (Tr. 13, 17). However, the ALJ did not list the findings of either Mr. Stenly or Dr. Congbalay. Although the ALJ stated that he based his RFC assessment on the opinion of Dr. Congbalay and the assessments of the examining and reviewing psychologists, the ALJ's decision fails to include a narrative explanation describing how the medical evidence of record supports the specific exertional and non-exertional limitations set forth in the ALJ's RFC finding as required by SSR 96-8p.[8] Simply listing some of the medical and other evidence contained in the record and setting forth an RFC conclusion without linking such evidence to the functional limitations ultimately imposed in the RFC is insufficient to meet the "narrative discussion" requirement of SSR 96-8. *See Coleman v. Astrue,* No. 3:10-464, 2010 WL 4955718, at \*5 (N.D.

---

[8]Social Security Ruling 96–8p provides in relevant part:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Ohio Nov. 18, 2010) (Report and Recommendation) (citing *Brown v. Comm'r of Soc. Sec.*, 245 F. Supp.2d 1175, 1186-87 (D. Kan. 2003)), *adopted,* 2010 WL 4955707 (N.D. Ohio Nov. 30, 2010).

Because the ALJ failed to link the medical evidence to plaintiff's functional limitations, it is impossible to discern whether the ALJ took the functional limitations imposed by plaintiff's obesity into account in rendering his RFC. Social Security Ruling 02-1p, 2002 WL 34686281, recognizes that obesity may cause many limitations in exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling; it may affect an individual's ability to climb, balance, stoop, crouch, manipulate, and tolerate extreme heat, humidity, or hazards; it may lead to drowsiness and lack of mental clarity during the day as a result of sleep apnea; and it may affect an individual's social functioning. *Id.* It is simply not clear from the ALJ's opinion whether and to what extent he took these factors into account in assessing plaintiff's RFC.

The ALJ's decision reflects that he considered plaintiff's statements regarding his symptoms and alleged limitations in assessing plaintiff's RFC. (Tr. 16). However, the ALJ's decision in this respect lacks any explanation that would allow this Court to understand the weight the ALJ actually gave to plaintiff's statements in determining his RFC. The ALJ concluded that plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms, while generally credible, are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 16). The ALJ determined that plaintiff's complaints to treating sources were consistent and his allegations as to the types of symptoms he has are consistent with the medical evidence of record, but that the objective medical finding have been relatively mild and "would not be expected to produce the alleged severity of these symptoms." (Tr. 16). This is the full extent of the ALJ's finding on the

25

weight given the plaintiff's statements concerning the limiting effects of his symptoms. The Court simply cannot discern from the ALJ's finding to what extent plaintiff's "credible" statements were accepted or rejected by the ALJ in devising the RFC decision.

The Court recognizes that it is the ALJ's responsibility to formulate the RFC. *See* 20 C.F.R. § 404.1546(c). *See also* 20 C.F.R. § 404.1527(e)(2) (the final responsibility for deciding RFC is reserved to the Commissioner even though "we consider opinions from medical sources on issues such as . . . your residual functional capacity"). Yet, in rendering the RFC decision, it is incumbent upon the ALJ to give some indication of the specific evidence relied upon and the findings associated with the particular RFC limitations to enable this Court to perform a meaningful judicial review of that decision. Otherwise, the Court is left to speculate on the method utilized and evidence relied upon by the ALJ in arriving at his RFC determination. Based on the state of the current record and the ALJ's decision, the Court is unable to discern the underlying basis for the ALJ's conclusion that plaintiff retains the functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally; to stand and/or walk for 6 hours in an 8-hour workday; and to perform the other postural functions listed in the RFC assessment. (Tr. 15). The ALJ was required to cite some substantial medical and other evidence in the record to support his findings on plaintiff's functional abilities and to provide a narrative discussion describing how the medical evidence supports each finding, which he failed to do. For these reasons, the Court finds that the ALJ's RFC determination is not supported by substantial evidence and should be reversed.

### E. This matter should be reversed and remanded for further proceedings.

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation. All essential factual

issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of his alleged onset date. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). This matter should be remanded for consideration of all of the relevant evidence of record, as well as reconsideration of plaintiff's RFC and the weight to afford the treating and examining sources, consistent with this Report and Recommendation.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _12/5/2011_

Karen L. Litkovitz
United States Magistrate Judge

MARK EVANS,
    Plaintiff

Case No. 1:10-cv-779
Dlott, J.
Litkovitz, M.J.

vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).